UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

EUGENIO PAGE-MORE
      Petitioner,

**05-40096WGY**

vs.

CR NO._____

CIV NO. _____

HOMELAND SECURITY OR THE OLD
INS  IMMIGRATION AND NATURALIZATION SERVICES

WARDEN DAVID L. WINN, et al.
      Respondent.

_____/

**PETITION FOR WRIT OF HABEAS COURPUS 28 U.S.C. § 2241; IN RE:
RELEASE FROM CUSTODY AND BRIEF.**

    **PETITIONER,** Eugenio Page More, respecfully moves this Honorable Court appearing pro-se requesting to grant all liberal considerations and construe this petition for release from custody and brief as it may deem appropiate in order to do substantial justice when address-ing the bases of the claims Haines vs. Kerner., 404 U.S. 519 (1992) "all pleadings shall be so constructed to do substantial justice". the petitioner moves the Court as follows:

JURISDICTION

    This Court has jurisdiction pursuant to 28 USC § 2241 et seq; U.S. constitution art. I § 8 Cl. 6 and 10. III § 2 Cl. 1, 2, and 3; and 28 U.S.C. § 1331. Venue reside in this court Ad Hoc as both the INS and petitioner reside and/or do business in the venue. I abide.

## BACKGROUND

The petitioner is a Cuban refugee, on or about 1999-2000, the petitioner went in front of the Honorable Judge Roberto Ruff at the state court of West Rosbury, Massachusetts.

Petitioner was acused of the violation of probation by his probation Officer, Lucila Matos who was the petitioner officer supervisor at the time , due to a one year probation imposed by the state of Massachusetts.

On the outcome of the hearing in front of Judge Ruff, the petitioner was found guilty for violation of probation and sentenced to one year served time at the state county jail of South Bay, Massachusetts.

After the petitioner completion of his state prison sentence of one year aproximately at the end of year 2000, the petitioner inmediately was transfered from the state custody to the INS, today home land security federal custody (defendant). The petitioner has not been out of custody since his initial state incarceration and denied release from federal prison, unconstitutionally for almost five years. Until now there was no hope for Cuban refugees who have no nation to return to. See attach; **Clark v. Martinez** 160 Led 2d (2005).

The petitioner is a political victim of the Castro Cuban communist dictatorial regime. Petitioner migrated to the United States seeking freedom, looking for the democratic way of life.

-2-

The petitioner is not a dangerous person nor he suffer from any mental defect, in fact attach to this motion is the later BOP team review and petitioner progress report, where he has been rated as a good worker with a clear conduct, with a commitment of completion of 2 adult continue education courses. The INS detainer originated after the release of petitioner from South Bay State Jail in Massachusetts. The petitioner is register under the INS files No. A 23 215 879.

## CHANGES OF CASE LAW

The Supreme Court has rule that the fedeal government may not hold "aliens", i.e. foreign nationals, more than 180 days past their release date on time to depart aliens from the U.S.A The watershed rule effectuates Cubans whom are not deportable because of politics in Washington, D.C.

In sum, the court is moved to order the respondents INS and/or B.O.P to immediately release this prisoner as he qualifies under **Clark v. Martinez** , and its progency.

The petitioner has a home and friends/family that are waiting for his return to integrated him as part of their circle as well as petitioner common-law Indalecia Montanez (see attachs). Any other information pertaining the petitioner will be furnished upon request.

## CONCLUSION

Petitioner moves the court to order him release within 10 days or as soon as reasonably possible for this court and defendants to reply, based upon **Clark vs. Martinez.**

Respectfully submitted,

Eugenio Page More
Reg # 01362-131  GA
F.M.C. Devens G-A
P.O. Bos 879
Ayer, MA. 01432

## CERTIFICATE OF SERVICE

I, **Eugenio Page More,** Petitioner, acting Pro Se, do hereby certify that I have served this motion along with my original motion 28 U.S.C § 2241, and swear under the penalty of perjury, that everything in the aforementioned motion is true to the best of my ability, so help me God.

1. The Clerk of the U.S District Court
   United States District Court for the
   District of Boston Massachusetts
   One Courthouse Way
   Boston, MA 02210

2. U.S.A
   U.S Attorney Office
   One Courthouse Way
   Suite  9200
   Boston Massachusetts 02210

Eugenio Page More

**ATTACHMENTS**

January 19, 2005

Counselor O'Connor
Federal Medical Center
P.O. Box 880
Ayer MA 01432

## RE: EUGENIO PAGES

**TO WHOM IT MAY CONCERN:**

My name is **INDALECIA MONTANEZ,** I am presently residing at 342 Bowdoin St., Apt 2, Dorchester MA 02121 and I hereby certify that I am the common-law wife of **EUGENIO PAGES** and I have known him for more than 20 years. I love him very much and at the present time he is very sick for which I am pleading with you to help him. I will be responsible for him and I am asking that you give him a chance. He also has one son and one sister both of whom are willing to be responsible for him.

Eugenio is a very good person and his health problem is worrying me a lot. I would be forever grateful with you. Should you need any further information don't hesitate to contact me at your earliest convenience at 617-822-9719.

Sincerely,

Indalecia Montanez

***Sworn to before me this
19th day of January of
the year 2005.***

JOSE A. MONTESINO
Notary Public
Commonwealth of Massachusetts
My Commission Expires Aug 14, 2009

February 17, 2004


Mr. W. Campbell
Low Security Correctional Institute
P.O. Box 1500
White Deer PA 17837

**RE: EUGENIO PAGES REGISTER NO. 01362-131**


**TO WHOM IT MAY CONCERN:**

My name is **INDALECIA MONTANEZ,** and I hereby certify that I am the wife of **EUGENIO PAGES** for more than 6 years.   I love him very much and at the present time he is very sick for which I am pleading with you to help him.   I will be responsible for him and I am asking that you give him a chance.


Eugenio is a very good person and his health problem is worrying me a lot.   I would be forever grateful with you.   Should you need any further information don't hesitate to contact me at your earliest convenience at 617-822-9719.


Sincerely,


Indalecia Montanez


*Sworn to before me this 17th day of February of the year 2004.*

JOSE A. MONTESINO
Notary Public
Commonwealth of Massachusetts
My Commission Expires
August 14, 2009

```
   DEVCV          *        PROGRAM REVIEW REPORT          *      04-29-2005
 PAGE 001                                                        10:07:40
```

INSTITUTION: DEV  DEVENS FMC

NAME.......: PAGES-MORE, EUGENIO                REG. NO: 01362-13?
RESIDENCE..: OAK INS, LA 7146?

TYPE OF REVIEW......: INITIAL CLASSIFICATION/PROGRAM REVIEW
NEXT REVIEW DATE....: _____4/1/05_____

PROJ. RELEASE DATE..: UNKNOWN               RELEASE METHOD.: UNKNOWN
PAROLE HEARING DATE.: NONE                  HEARING TYPE...: NONE

DATE OF NEXT CUSTODY REVIEW: ___N/A_____    DETAINERS (Y/N): Y

CIM STATUS (Y/N)....: Y          IF YES, RECONCILED (Y/N): ___Y_____

PENDING CHARGES.....: _____ICE Detainer — Mariel_____

OFFENDER IS SUBJECT TO NOTIFICATION UNDER 18 U.S.C. 4042(B) (Y/N)....: _N_
    IF YES - CIRCLE ONE - DRUG TRAFFICKING/CURRENT VIOLENCE/PAST VIOLENCE

| CATEGORY | - - - - - - | CURRENT ASSIGNMENT - - - - - - - - | EFF DATE | TIME |
|---|---|---|---|---|
| CMA | CRP RV DT | CLSFN REVIEW PANEL HRNG DUE DT | 05-07-2005 | 0825 |
| CMA | IHP CMPWDE | IMM HRG COMPL-WILL DEPORT-EOIR | 12-10-1981 | 1459 |
| CMA | MARIEL | MARIEL CUBAN | 09-29-1995 | 0852 |
| CMA | MENTAL IN | MENTAL HEALTH INPATIENT | 03-29-1996 | 0838 |
| CMA | PROG RPT | NEXT PROGRESS REPORT DUE DATE | 01-07-2008 | 0846 |
| CMA | RPP PART | RELEASE PREP PGM PARTICIPATES | 05-17-2004 | 1332 |
| CMA | V94 COB913 | V94 CUBR OTHER BEFORE 91 ?4 | 05-28-1996 | 0805 |
| CUS | IN | IN CUSTODY | 04-26-2002 | 1553 |
| DRG | DRG I NONE | NO DRUG INTERVIEW REQUIRED | 07-22-2002 | 1924 |
| DRG | ED WAIT V | DRUG EDUCATION WAIT-VOLUNTEER | 12-17-2002 | 1451 |
| EDT | ESL TEMP X | ESL NEED-TEMPORARILY EXEMPT | 12-28-2004 | 0858 |
| EDI | GED TN | EXEMPT/TEMP GED NON-PROMOTABLE | 12-28-2004 | 0858 |
| EDI | GED UNSAT | GED PROGRESS UNSATISFACTORY | 12-05-1997 | 1517 |
| FRP | NO OBLG | FINANC RESP-NO OBLIGATION | 05-18-2004 | 1543 |
| LEV | LOW | SECURITY CLASSIFICATION LOW | 04-26-2002 | 1557 |
| MDS | COLD/WIND | NO EXCESS COLD/WIND | 11-04-2002 | 1551 |
| MDS | LOWER BUNK | LOWER BUNK REQUIRED | 12-29-2004 | 1007 |
| MDS | NO F/S | NO FOOD SERVICE WORK | 10-08-2002 | 0648 |
| MLS | REG DUTY W | REGULAR DUTY W/MED RESTRICTION | 01-22-2005 | 0001 |
| MDS | SOFT SHOES | SOFT SHOES ONLY | 02-02-2004 | 0928 |
| MDS | STAND RSTR | NO PROLONGED STANDING | 11-04-2002 | 1551 |
| MDS | WGT 15 LB | WEIGHT-NO LIFTING OVER 15 LBS | 10-08-2002 | 0648 |
| QTR | G01-108L | HOUSE G/RANGE 01/BED 108L | 10-12-2004 | 1707 |
| RLG | CATHOLIC | CATHOLIC | 02-23-1996 | 0737 |
| WRK | CCS ORD PM | CCS ORDERLY PM | 02-05-2005 | 0001 |

WORK PERFORMANCE RATING: __Good  ratings  as  CCS  orderly__

_____

INCIDENT REPORTS SINCE LAST PROGRAM REVIEW: _____
_Clear  conduct_____

_____

FRP PLAN/PROGRESS: _No  obligation_____

_Comm dep  $480.48    ITS  balance—$19.96_

```
  DEVCV          *        PROGRAM REVIEW REPORT        *     04-29 2005
  PAGE 002                                                   10:07:40
```

RELEASE PREPARATION PARTICIPATION: *Should enroll at this time*

CCC RECOMMENDATION: *Pending ICE Approval*

PROGRESS MADE SINCE LAST REVIEW: *Clear conduct good work ratings, No ACE courses completed.*

GOALS FOR NEXT PROGRAM REVIEW MEETING: *Complete 2 ACE courses, earn good work ratings and maintain clear conduct thru 11/05.*

LONG TERM GOALS: *Complete the RPP prior to release.*

OTHER INMATE REQUESTS/TEAM ACTIONS: *None*

*U07/408 reviewed.*

DEV           *           PROGRAM REVIEW REPORT           *           04-29-2005
PAGE  03 OF 003                                                       10:07:40

SIGNATURES:

UNIT MANAGER: _Tony Calibro_           INMATE: _P__ _____

           DATE: _5/6/05_____           DATE: ___5/6/05_____

(Slip Opinion)          OCTOBER TERM, 2004          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CLARK, FIELD OFFICE DIRECTOR, SEATTLE, IMMIGRATION AND CUSTOMS ENFORCEMENT, ET AL. *v.* MARTINEZ

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 03–878. Argued October 13, 2004—Decided January 12, 2005*

If an alien is found inadmissible and ordered removed, the Secretary of Homeland Security (Secretary) ordinarily must remove the alien from the country within 90 days. 8 U. S. C. §1231(a)(1)(A). Here, Martinez, respondent in No. 03–878, and Benitez, petitioner in No. 03–7434, Cuban nationals who are both inadmissible under §1182, were ordered removed, but were detained beyond the 90-day removal period. Each filed a habeas corpus petition challenging his continued detention. In Martinez's case, the District Court found that removal was not reasonably foreseeable and ordered that Martinez be released under appropriate conditions. The Ninth Circuit affirmed. In Benitez's case, the District Court also accepted that removal would not occur in the foreseeable future, but nonetheless denied the petition. The Eleventh Circuit affirmed.

*Held:*

1. Under §1231(a)(6), the Secretary may detain inadmissible aliens beyond the 90-day removal period, but only for so long as is reasonably necessary to achieve removal. Section 1231(a)(6)'s operative language, "may be detained beyond the removal period," applies equally to all aliens that are its subject, whether or not those aliens have been admitted to the country. *In Zadvydas* v. *Davis,* 533 U. S. 678, this Court interpreted §1231(a)(6) to authorize the detention of aliens

---

* Together with No. 03–7434, *Benitez* v. *Rozos, Field Office Director, Miami, Immigration and Customs Enforcement;* on certiorari to the United States Court of Appeals for the Eleventh Circuit.

Cite as: 543 U. S. ____ (2005)                    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 03–878 and 03–7434

A. NEIL CLARK, FIELD OFFICE DIRECTOR,
SEATTLE, WASHINGTON, IMMIGRATION
AND CUSTOMS ENFORCEMENT, ET AL.,
PETITIONERS

03–878    v.

SERGIO SUÁREZ MARTINEZ

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

DANIEL BENITEZ, PETITIONER

03–7434          v.

MICHAEL ROZOS, FIELD OFFICE DIRECTOR, MIAMI,
FLORIDA, IMMIGRATION AND CUSTOMS
ENFORCEMENT

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[January 12, 2005]

JUSTICE SCALIA delivered the opinion of the Court.

An alien arriving in the United States must be inspected by an immigration official, 66 Stat. 198, as amended, 8 U. S. C. §1225(a)(3), and, unless he is found "clearly and beyond a doubt entitled to be admitted," must generally undergo removal proceedings to determine admissibility, §1225(b)(2)(A). Meanwhile the alien may be detained, subject to the Secretary's discretionary authority to parole him into the country. See 8 U. S. C. §1182(d)(5); 8 CFR §212.5 (2004). If, at the conclusion of removal proceed-

Opinion of the Court

in California, Pet. for Cert. in No. 03–878, at 7; when Benitez sought adjustment in 1985, he had been convicted of grand theft in Florida, 337 F. 3d, at 1290. Both men were convicted of additional felonies after their adjustment applications were denied: Martinez of petty theft with a prior conviction (1996), assault with a deadly weapon (1998), and attempted oral copulation by force (1999), see Pet. for Cert. in No. 03–878, at 7–8; Benitez of two counts of armed robbery, armed burglary of a conveyance, armed burglary of a structure, aggravated battery, carrying a concealed firearm, unlawful possession of a firearm while engaged in a criminal offense, and unlawful possession, sale, or delivery of a firearm with an altered serial number (1993), see 337 F. 3d, at 1290–1291.

The Attorney General revoked Martinez's parole in December 2000. Martinez was taken into custody by the INS, and removal proceedings were commenced against him. Pet. for Cert. in No. 03–878, at 8. An Immigration Judge found him inadmissible by reason of his prior convictions, §1182(a)(2)(B), and lack of sufficient documentation, §1182(a)(7)(A)(i)(I), and ordered him removed to Cuba. Martinez did not appeal. Pet. for Cert. in No. 03–878, at 8. The INS continued to detain him after expiration of the 90-day removal period, and he remained in custody until he was released pursuant to the District Court order that was affirmed by the Court of Appeals' decision on review here. *Id.*, at 9.

Benitez's parole was revoked in 1993 (shortly after he was imprisoned for his convictions of that year), and the INS immediately initiated removal proceedings against him. In December 1994, an Immigration Judge determined Benitez to be excludable and ordered him deported under §§1182(a)(2)(B) and 1182(a)(7)(A)(i)(I) (1994 ed. and Supp. V).[2] 337 F. 3d, at 1291. Benitez did not seek fur-

---

[2] Before the 1996 enactment of the Illegal Immigration Reform and

INS to release Martinez under conditions that the INS believed appropriate. *Martinez* v. *Smith*, No. CV 02–972–PA (Oct. 30, 2002), App. to Pet. for Cert. in No. 03–878, p. 2a. The Court of Appeals for the Ninth Circuit summarily affirmed, citing its decision in *Xi* v. *INS*, 298 F. 3d 832 (2002). *Martinez* v. *Ashcroft*, No. 03–35053 (Aug. 18, 2003), App. to Pet. for Cert. in No. 03–878, at 1A. In Benitez's case, the District Court for the Northern District of Florida also concluded that removal would not occur in the "foreseeable future," but nonetheless denied the petition. *Benitez* v. *Wallis*, Case No. 5:02cv19 MMP (July 11, 2002), pp. 2, 4, App. in No. 03–7434, pp. 45, 48. The Court of Appeals for the Eleventh Circuit affirmed, agreeing with the dissent in *Xi. Benitez* v. *Wallis*, 337 F. 3d 1289 (2003). We granted certiorari in both cases. *Benitez* v. *Wallis*, 540 U. S. 1147 (2004); *Crawford* v. *Martinez*, 540 U. S. 1217 (2004).

II

Title 8 U. S. C. §1231(a)(6) provides, in relevant part, as follows:

"An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the [Secretary] to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)."

By its terms, this provision applies to three categories of aliens: (1) those ordered removed who are inadmissible under §1182, (2) those ordered removed who are removable under §1227(a)(1)(C), 1227(a)(2), or 1227(a)(4), and (3) those ordered removed whom the Secretary determines to be either a risk to the community or a flight risk. In *Zadvydas* v. *Davis*, 533 U. S. 678 (2001), the Court inter-

can be read to "suggest [less than] unlimited discretion" to detain, *id.*, at 697. It cannot, however, be interpreted to do both at the same time.

The dissent's belief that *Zadvydas* compels this result rests primarily on that case's statement that "[a]liens who have not yet gained initial admission to this country would present a very different question," 533 U.S., at 682. See *post*, at 3–4, 6 (opinion of THOMAS, J.). This mistakes the reservation of a question with its answer. Neither the opinion of the Court nor the dissent in *Zadvydas* so much as hints that the Court adopted the novel interpretation of §1231(a)(6) proposed by today's dissent. The opinion in that case considered whether §1231(a)(6) permitted the Government to detain removable aliens indefinitely; relying on ambiguities in the statutory text and the canon that statutes should be interpreted to avoid constitutional doubts, the opinion held that it did not. Despite the dissent's repeated claims that §1231(a)(6) could not be given a different reading for inadmissible aliens, see *Zadvydas*, *supra*, at 710, 716–717, the Court *refused to decide* that question—the question we answer today. It is indeed different from the question decided in *Zadvydas*, but because the statutory text provides for no distinction between admitted and nonadmitted aliens, we find that it results in the same answer.[4]

The dissent's contention that our reading of *Zadvydas* is "implausible," *post*, at 2, is hard to reconcile with the fact

---

[4] The dissent is quite wrong in saying, *post*, at 4, that the *Zadvydas* Court's belief that §1231(a)(6) did not apply to all aliens is evidenced by its statement that it did not "consider terrorism or other special circumstances where special arrangements might be made for forms of preventive detention," 533 U.S., at 695. The Court's interpretation of §1231(a)(6) did not affect the detention of alien terrorists for the simple reason that sustained detention of alien terrorists is a "special arrangement" authorized by a different statutory provision, 8 U.S.C. §1537(b)(2)(C). See *Zadvydas*, 533 U.S., at 697.

Opinion of the Court

tion cases "[b]ecause we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context"); *United States* v. *Thompson/Center Arms Co.*, 504 U. S. 505, 517–518, and n. 10 (1992) (plurality opinion) (employing the rule of lenity to interpret "a tax statute . . . in a civil setting" because the statute "has criminal applications"); *id.*, at 519 (SCALIA, J., concurring in judgment) (also invoking the rule of lenity). In other words, when deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court.[5]

The dissent takes issue with this maxim of statutory construction on the ground that it allows litigants to "attack statutes as constitutionally invalid based on constitutional doubts concerning other litigants or factual circumstances" and thereby to effect an "end run around blackletter constitutional doctrine governing facial and as-applied constitutional challenges." *Ante*, at 10. This accusation misconceives—and fundamentally so—the role played by the canon of constitutional avoidance in statutory interpretation. The canon is not a method of adjudicating constitutional questions by other means. See, *e.g.*, *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 502 (1979) (refusing to engage in extended analysis in the

---

[5] Contrary to the dissent's contentions, *post*, at 8, our decision in *Salinas* v. *United States*, 522 U. S. 52 (1997), is perfectly consistent with this principle of construction. In *Salinas*, the Court rejected the petitioner's invocation of the avoidance canon because the text of the statute was "unambiguous on the point under consideration." 522 U. S., at 60. For this reason, the Court squarely addressed and rejected any argument that the statute was unconstitutional as applied to the petitioner. *Id.*, at 61 (holding that, under the construction adopted by the Court, "the statute is constitutional as applied in this case").

Opinion of the Court

United States Employees' Compensation Commission " 'full power and authority to hear and determine all questions in respect of' " claims under the Longshoremen's and Harbor Workers' Compensation Act. 285 U. S., at 62. The question presented was whether this provision precluded review of the Deputy Commissioner's determination that the claimant was an employee, and hence covered by the Act. The Court held that, although the statute could be read to bar judicial review altogether, it was also susceptible of a narrower reading that permitted judicial review of the fact of employment, which was an "essential condition precedent to the right to make the claim." *Ibid.* The Court adopted the latter construction in order to avoid serious constitutional questions that it believed would be raised by total preclusion of judicial review. *Ibid.* This holding does *not* produce a statute that bears two different meanings, depending on the presence or absence of a constitutional question. Always, and as applied to all claimants, it permits judicial review of the employment finding. What corresponds to *Crowell* v. *Benson*'s holding that the fact of employment is judicially reviewable is *Zadvydas*'s holding that detention cannot be continued once removal is no longer reasonably foreseeable—and, like the one, the other applies in all cases.

The dissent, on the other hand, relies on our recent cases interpreting 28 U. S. C. §1367(d). *Raygor* v. *Regents of Univ. of Minn.*, 534 U. S. 533 (2002), held that this provision does not include, in its tolling of limitations periods, claims against States that have not waived their immunity from suit in federal court, because the statutory language fails to make " 'unmistakably clear,' " as it must in provisions subjecting States to suit, that such States were covered. *Id.*, at 543–546. A subsequent decision, *Jinks* v. *Richland County,* 538 U. S. 456 (2003), held that the tolling provision *does* apply to claims against political subdivisions of States, since the requirement of the unmis-

*since* interpreting the statute to authorize indefinite detention (one plausible reading) would approach constitutional limits, the statute should be read (in line with the other plausible reading) to authorize detention only for a period consistent with the purpose of effectuating removal. 533 U. S., at 697–699. If we were, as the Government seems to believe, free to "interpret" statutes as becoming inoperative when they "approach constitutional limits," we would be able to spare ourselves the necessity of ever finding a statute unconstitutional as applied. And the doctrine that statutes should be construed to contain substantive dispositions that do not raise constitutional difficulty would be a thing of the past; no need for such caution, since—*whatever* the substantive dispositions are—they become inoperative when constitutional limits are "approached." That is not the legal world we live in. The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as a *means* of *choosing between them.* See, e.g., *Almendarez-Torres* v. *United States,* 523 U. S. 224, 237–238 (1998); *United States ex rel. Attorney General* v. *Delaware & Hudson Co.,* 213 U. S. 366, 408 (1909). In *Zadvydas,* it was the statute's text read in light of its purpose, not some implicit statutory command to avoid approaching constitutional limits, which produced the rule that the Secretary may detain aliens only for the period reasonably necessary to bring about their removal. See 533 U. S., at 697–699.

In passing in its briefs, but more intensively at oral argument, the Government sought to justify its continued detention of these aliens on the authority of §1182(d)(5)(A).[7] Even assuming that an alien who is

___
[7] Section 1182(d)(5)(A) reads as follows:

"The [Secretary] may ... in his discretion parole into the United

Opinion of the Court

indefinite detention in the face of *Zadvydas* would establish within our jurisprudence, beyond the power of Congress to remedy, the dangerous principle that judges can give the same statutory text different meanings in different cases.

Since the Government has suggested no reason why the period of time reasonably necessary to effect removal is longer for an inadmissible alien, the 6-month presumptive detention period we prescribed in *Zadvydas* applies. See 533 U. S., at 699–701. Both Martinez and Benitez were detained well beyond six months after their removal orders became final. The Government having brought forward nothing to indicate that a substantial likelihood of removal subsists despite the passage of six months (indeed, it concedes that it is no longer even involved in repatriation negotiations with Cuba); and the District Court in each case having determined that removal to Cuba is not reasonably foreseeable; the petitions for habeas corpus should have been granted. Accordingly, we affirm the judgment of the Ninth Circuit, reverse the judgment of the Eleventh Circuit, and remand both cases for proceedings consistent with this opinion.

*It is so ordered.*

---

§1226a(a)(6) (2000 ed., Supp. II)).

2                    CLARK *v.* MARTINEZ

O'CONNOR, J., concurring

the Government shows that to be true, then detention beyond six months will be lawful within the meaning we ascribed to 8 U. S. C. §1231(a)(6) in *Zadvydas.*

Moreover, the Government has other statutory means for detaining aliens whose removal is not foreseeable and whose presence poses security risks. Upon certifying that he has "reasonable grounds to believe" an alien has engaged in certain terrorist or other dangerous activity specified by statute, 8 U. S. C. §1226a(a)(3) (2000 ed., Supp. II), the Secretary of Homeland Security may detain that alien for successive six-month periods "if the release of the alien will threaten the national security of the United States or the safety of the community or any person," §1226a(a)(6).

Finally, any alien released as a result of today's holding remains subject to the conditions of supervised release. See 8 U. S. C. §1231(a)(3); 8 CFR §241.5 (2004). And, if he fails to comply with the conditions of release, he will be subject to criminal penalties—including further detention. See 8 U. S. C. §1253(b); *Zadvydas, supra,* at 695 ("We nowhere deny the right of Congress . . . to subject [aliens] to supervision within conditions when released from detention, or to incarcerate them where appropriate for violations of those conditions").

THOMAS, J., dissenting

Today, the Court holds that this constitutional distinc-
tion—which "made all the difference" to the *Zadvydas*
Court, *id.*, at 693—is actually irrelevant, because "[t]he
operative language of §1231(a)(6) ... applies without
differentiation to all three categories of aliens that are its
subject." *Ante*, at 6. While I wholeheartedly agree with
the Court's fidelity to the text of §1231(a)(6), the Court's
analysis cannot be squared with *Zadvydas*. And even if it
could be so squared, *Zadvydas* was wrongly decided and
should be overruled. I respectfully dissent.

I

I begin by addressing the majority's interpretation of
*Zadvydas*. The Court's interpretation is not a fair reading
of that case. It is also not required by any sound principle
of statutory construction of which I am aware. To the
contrary, what drives the majority's reading is a novel
"lowest common denominator" principle. *Ante*, at 8.

A

The majority's reading of *Zadvydas* is implausible.
*Zadvydas* held that interpreting §1231(a)(6) to authorize
indefinite detention of admitted aliens later found remov-
able would raise serious due process concerns. 533 U. S.,
at 690–696. The Court therefore read the statute to per-
mit the Attorney General (now the Secretary of Homeland
Security) to detain admitted aliens only as long as rea-
sonably necessary to remove them from the country. *Id.*,
at 699.

The majority concedes that *Zadvydas* explicitly reserved
the question whether its statutory holding as to *admitted*
aliens applied equally to *inadmissible* aliens. *Ante*, at 7.
This reservation was front and center in *Zadvydas*. It
appeared in the introduction and is worth repeating in
full:

"In these cases, we must decide whether [§1231(a)(6)]

the constitutional concerns involved in each case, then the
question of how §1231(a)(6) applies to them would not be
"very different" depending on the alien before the Court.
The question would be trivial, because the text of
§1231(a)(6) plainly does not distinguish between admitted
and nonadmitted aliens. There would also have been no
need for the Court to go out of its way to leave aside "ter-
rorism or other special circumstances," *id.,* at 696, or to
disavow "considerat[ion of] the political branches' author-
ity to control entry into the United States," *id.,* at 695, for
the construction the majority extracts from *Zadvydas*
would have applied across the board, *ibid.* And the
Court's rationalization that its construction would there-
fore "leave no unprotected spot in the Nation's armor," *id.,*
at 695–696 (internal quotation marks omitted), would
have been incorrect. The constitutional distinctions that
pervade *Zadvydas* are evidence that the "very different"
statutory question it reserved turned on them.

The *Zadvydas* Court thus tethered its reading of
§1231(a)(6) to the specific class of aliens before it. The
term this Court read into the statute was not simply a
presumptive 6-month period, but a presumptive 6-month
period for admitted aliens. Its reading of the statute "in
light of the Constitution's demands," *id.,* at 689, that is,
depended on the constitutional considerations at work in
*"the cases before [it],"* *id.,* at 695 (emphasis added). One
would expect the Court today, then, to follow the same
two-step procedure it employed in *Zadvydas.* It should
first ask whether the statute is ambiguous and, if so,
whether one of the possible interpretations raises consti-
tutional doubts as applied to Martinez and Benitez. Step
one is dictated by *Zadvydas:* §1231(a)(6) is not clear on
whether it permits indefinite detention. The Court should
then move to the second step and ask whether either of
the statute's possible interpretations raises constitutional
doubts as applied to Benitez and Martinez. If so, the

6                      CLARK v. MARTINEZ

THOMAS, J., dissenting

the dissent's premise that "it is not a plausible construc-
tion of §1231(a)(6) to imply a time limit as to one class and
not to another." *Id.*, at 710 (opinion of KENNEDY, J.). But
the *Zadvydas* majority disagreed with that assumption
and adopted a contrary interpretation of §1231(a)(6). For
as the dissent recognized, *Zadvydas*' "logic might be that
inadmissible and removable aliens might be treated dif-
ferently." *Ibid.* That was *Zadvydas*' logic precisely, as its
repeated statements limiting its decision to inadmissible
aliens show.   To interpret *Zadvydas* properly, we must
take its logic as given, not the logic of the *reductio ad
absurdum* of *Zadvydas* that I joined in dissent.

                            B

    The majority strains to recharacterize *Zadvydas* be-
cause it thinks that "[i]t is not at all unusual to give a
statute's ambiguous language a limiting construction
called for by one of the statute's applications, even though
other of the statute's applications, standing alone, would
not support the same limitation." *Ante*, at 8.  In other
words, it claims, "[t]he lowest common denominator, as it
were, must govern." *Ibid.* I disagree.

    As an initial matter, this principle is inconsistent with
*Zadvydas* itself.   As explained above, the limiting con-
struction *Zadvydas* adopted as to admitted aliens does not
necessarily govern the other applications of §1231(a)(6). If
the majority is correct that the "lowest common denomina-
tor" governs, then the careful distinction *Zadvydas* drew
between admitted aliens and nonadmitted aliens was
irrelevant at best and misleading at worst.  Under this
reading, *Zadvydas* would have come out the same way
even if it had involved inadmissible aliens, for the "lowest
common denominator" of the statute remains the same
regardless of the identity of the alien before the Court.
Again, this understanding of *Zadvydas* is implausible.

    Beyond *Zadvydas*, the Court offers scant support for the

claims against States." *Ante*, at 12. But as the Court con-
cedes, *Jinks* reached that holding only after analyzing
whether the constitutional doubts at issue in *Raygor* applied
to the county defendant. *Ante*, at 12, n. 6. The Court's
failure to do the same here cannot be reconciled with *Jinks*
and *Raygor:* the Court should ask whether the constitu-
tional concerns that justified the requirement of a clear
statement in *Zadvydas* apply as well to inadmissible aliens.

The Court's "lowest common denominator" principle is
also in tension with *Salinas v. United States*, 522 U. S. 52
(1997). There, we rejected an argument that the federal
bribery statute, 18 U. S. C. §666(a)(1)(B) should be con-
strued to avoid constitutional doubts, in part on the ground
that there was "no serious *doubt* about the constitutionality
of §666(a)(1)(B) as applied to the facts of this case." 522
U. S., at 60 (emphasis added). Unlike the Court's approach
to avoidance today, we disclaimed examination of the consti-
tutionality of applications not before the Court: "Whatever
might be said about §666(a)(1)(B)'s application in other
cases, the application of §666(a)(1)(B) did not extend federal
power beyond its proper bounds." *Id.*, at 61. The Court is
mistaken that this passage in *Salinas* was a rejection of a
constitutional argument on its merits. *Ante*, at 9, n. 5.
Salinas, the petitioner, phrased his question presented
solely in terms of the proper statutory interpretation of
§666(a)(1)(B) Brief for Petitioner, O. T. 1996, No. 96–738,
p. i, and never claimed that the statute was unconstitu-
tional, see generally *ibid.*

### C

More importantly, however, the Court's "lowest common
denominator" principle is inconsistent with the history of
the canon of avoidance and is likely to have mischievous
consequences. The modern canon of avoidance is a doc-
trine under which courts construe ambiguous statutes to
avoid constitutional doubts, but this doctrine has its ori-

CLARK v. MARTINEZ

THOMAS, J., dissenting

tional version. Under modern avoidance, in other words,
an ambiguous statute should be read to avoid a constitu-
tional doubt only if the statute is constitutionally doubtful
as applied to the litigant before the court (again, unless
the constitutional challenge involves third-party rights).
Yet the Court's lowest common denominator principle
allows a limiting construction of an ambiguous statute
prompted by constitutional doubts to infect other applica-
tions of the statute—even if the statute raises no constitu-
tional doubt as applied to the specific litigant in a given
case and even if the constitutionally unproblematic appli-
cation of the statute to the litigant is severable from the
constitutionally dubious applications. The lowest-common
denominator principle thus allows an end run around
black-letter constitutional doctrine governing facial and
as-applied constitutional challenges to statutes: A litigant
ordinarily cannot attack statutes as constitutionally inva-
lid based on constitutional doubts concerning other liti-
gants or factual circumstances.

The Court misses the point by answering that the canon
of constitutional avoidance "is not a method of adjudicat-
ing constitutional questions by other means," and that the
canon rests on a presumption that "Congress did not
intend the alternative which raises serious constitutional
doubts." *Ante*, at 10. That is true, but in deciding whether
a plausible interpretation "raises serious constitutional
doubts," a court must employ the usual rules of constitu-
tional adjudication. See *ante*, at 9 (noting that whether an
interpretation is constitutionally doubtful turns on
whether it raises "a multitude of constitutional prob-
lems"); *Zadvydas*, 533 U. S., at 690–696 (extensively em-
ploying constitutional analysis). Those rules include
doctrines governing third-party constitutional challenges
and the like. Moreover, the reason that courts perform
avoidance at all, in any form, is that we assume "Congress
intends statutes to have effect to the full extent the Con-

THOMAS, J., dissenting

Zadvydas himself, not its hypothetical application to other aliens, as its careful distinction between admitted and inadmissible aliens shows. To the extent that the rule of lenity is a nonconstitutionally based presumption about the interpretation of criminal statutes, the *Thompson/Center Arms* interpretive principle is fundamentally different from the canon of constitutional avoidance, because the rule of lenity is wholly independent of the rules governing constitutional adjudication. Either way, this case does not support the majority's restatement of modern avoidance principles.

The cases at bar illustrate well the exception to the normal operation of as-applied constitutional adjudication that the Court's approach creates. Congress explicitly provided that unconstitutional applications of §1231(a)(6) should be severed from constitutional applications. [4] Congress has thus indicated that courts should examine whether §1231(a)(6) raises a constitutional doubt application by application. After all, under the severability clause, if *Zadvydas* had held unconstitutional the indefinite detention of Zadvydas and Ho Ma, the constitutionality of the Secretary's indefinite detention of Benitez and Martinez would remain an open question. Although *Zadvydas* did not formally hold §1231(a)(6) to be unconstitutional as applied to the aliens before it, the same procedure should be followed when analyzing whether §1231(a)(6) raises a constitutional doubt. [5] The Court

---

[4] "If any provision of this division . . . or the application of such provision to any person or circumstances is held to be unconstitutional, the remainder of this division and the application of the provisions of this division to any person or circumstance shall not be affected thereby." Note following 8 U. S. C. §1101, p. 840 (Separability).

[5] *Crowell v. Benson*, 285 U. S. 22 (1932), bolsters my approach. Employing the canon of avoidance, the Court construed a statute in that case to allow judicial review of jurisdictional facts but not legislative facts. It did so even though the terms of the statute itself did not distinguish between the two sorts of facts. *Id.*, at 62–63. The presence of a severability provi-

THOMAS, J., dissenting

In truth, the Court's aggressive application of modern constitutional avoidance doctrine poses the greater danger. A disturbing number of this Court's cases have applied the canon of constitutional doubt to statutes that were on their face clear. See, e.g., INS v. St. Cyr, 533 U. S. 289, 327–336 (2001) (SCALIA, J., dissenting); Public Citizen v. Department of Justice, 491 U. S. 440, 481–482 (1989) (KENNEDY, J., concurring in judgment); Lowe v. SEC, 472 U. S. 181, 212–213 (1985) (White, J., concurring in result). This Court and others may now employ the "lowest common denominator" approach to limit the application of statutes wholesale by searching for hypothetical unconstitutional applications of them—or, worse yet, hypothetical constitutional doubts—despite the absence of any facial constitutional problem (at least, so long as those hypothetical doubts pose "a multitude of constitutional problems," ante, at 9). This is so even if Congress has expressed its clear intent that unconstitutional applications should be severed from constitutional applications, regardless of whether the challenger has third-party standing to raise the constitutional issue, and without the need to engage in full-fledged constitutional analysis.

This danger is real. In St. Cyr, this Court held that the Immigration and Nationality Act (INA) did not divest district courts of jurisdiction under 28 U. S. C. §2241 over habeas actions filed by criminal aliens to challenge removal orders, 533 U. S., at 314. The Court did so because it thought that otherwise the statute would preclude any avenue of judicial review of removal orders of criminal aliens, thus raising a serious Suspension Clause question. Id., at 305. This was a construction of (among other provisions) 8 U. S. C. §§1252(a)(1) and 1252(b)(9), and 28 U. S. C. §2241, none of which distinguishes between criminal and noncriminal aliens. 533 U. S., at 308–314. The INA, however, clearly allows noncriminal aliens, unlike criminal aliens, a right to judicial review of removal

16        CLARK v. MARTINEZ

THOMAS, J., dissenting

*Hilton* v. *South Carolina Public Railways Comm'n*, 502 U. S. 197, 205 (1991). This rule, however, is not absolute, and we should not hesitate to allow our precedent to yield to the true meaning of an Act of Congress when our statutory precedent is "unworkable" or "badly reasoned." *Holder* v. *Hall*, 512 U. S. 874, 936 (1994) (THOMAS, J., concurring in judgment) (quoting *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991) (internal quotation marks omitted)). "[W]e have never applied *stare decisis* mechanically to prohibit overruling our earlier decisions determining the meaning of statutes." *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 695 (1978). The mere fact that Congress can overturn our cases by statute is no excuse for failing to overrule a statutory precedent of ours that is clearly wrong, for the realities of the legislative process often preclude readopting the original meaning of a statute that we have upset.

*Zadvydas*' reading of §1231(a)(6) is untenable. Section 1231(a)(6) provides that aliens whom the Secretary of Homeland Security has ordered removed "may be detained beyond the removal period." There is no qualification to this authorization, and no reference to a "reasonable time" limitation. Just as we exhaust the aid of the "traditional tools of statutory construction," *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843, n. 9 (1984), before deferring to an agency's interpretation of a statute, so too should we exhaust those tools before deciding that a statute is ambiguous and that an alternative plausible construction of the statute should be adopted.

Application of those traditional tools begins and ends with the text of §1231(a)(6). *Zadvydas*' observation that "if Congress had meant to authorize long-term detention of unremovable aliens, it certainly could have spoken in clearer terms," 533 U. S., at 697, proves nothing. Congress could have spoken more clearly in any statutory case in which the statute does not mention the particular fac-

18              CLARK v. MARTINEZ

Court's assurance that if "the security of our borders will be
compromised if [the United States] must release into the
country inadmissible aliens who cannot be removed. . . .
Congress can attend to it," *ante*, at 14, rings hollow. Short
of constitutional amendment, it is only within the power of
this Court to correct *Zadvydas*' error.

The Court points to 8 U. S. C. §1226a(a)(6) (2000 ed.,
Supp. II), a statute that Congress passed shortly after
*Zadvydas*, as evidence that Congress can correct *Zadvy-
das*' mistake. *Ante*, at 14–15, n. 8.  This statute only
confirms my concern that *Zadvydas* is legislatively uncor-
rectable.  Section 1226a(a)(6) authorizes detention for a
period of six months beyond the removal period of aliens
who present a national security threat, but only to the
extent that those aliens' removal is not reasonably fore-
seeable. *Ante*, at 14–15, n. 8. Yet *Zadvydas* conceded that
indefinite detention might not violate due process in "cer-
tain special and narrow nonpunitive circumstances
where a special justification, such as harm-threatening
mental illness, outweighs the individual's constitutionally
protected interest in avoiding physical restraint."  533
U. S., at 690 (internal quotation marks and citations
omitted).  Moreover, *Zadvydas* set a 6-month presumptive
outer limit on the detention power.  *Id.*, at 701.  Congress
crafted §1226a(a)(6) to operate within the boundaries *Zad-
vydas* set.  This provision says nothing about whether Con-
gress may authorize detention of aliens for greater lengths
of time or for reasons the Court found constitutionally prob-
lematic in *Zadvydas*.

                    *    *    *

For the foregoing reasons, I would affirm the judgment
of the Eleventh Circuit and reverse the judgment of the
Ninth Circuit. I therefore respectfully dissent.

---

circumstances," citing *Zadvydas*).